IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

PORSCHE KEMP,
    *Plaintiff*,

v.

AROMA 360, LLC,
    *Defendant*.

Civil Action No.
25-cv-1630-ABA

**MEMORANDUM OPINION**

Plaintiff Porsche Kemp purchased a large, scented candle (55 oz, four wicks) on the website aroma360.com. She alleges that it was defective: instead of the wicks burning like a regular candle, the entire candle itself combusted, and burned her hands and arms when she tried to extinguish the flames. She has sued Defendant Aroma 360, LLC ("Aroma 360") alleging claims of product liability, negligence, and gross negligence. In response, Aroma 360 filed a motion to stay litigation and compel arbitration. For the reasons that follow, Aroma 360's motion will be granted.

**I.    Background[1]**

On or about December 1, 2024, Kemp purchased the candle from Aroma 360 through its online storefront. ECF Nos. 6 ¶¶ 6, 8, 9. Kemp alleges that, when the candle arrived in the mail, there were no instructions or warning labels on the inside or outside of the cardboard box that contained the candle. *Id.* ¶¶ 10–11. Kemp alleges that the only label was at the bottom of the candle in small text. *Id.* ¶ 12. Around Christmas 2024,

---

[1] In deciding a motion to compel arbitration, "this Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party." *Caire v. Conifer Value Based Care, LLC*, 982 F. Supp. 2d. 582, 589 (D. Md. 2013) (citing *Scott v. Harris*, 550 U.S. 372, 378 (2007)).

Kemp lit the candle for the first time to test the smell. *Id.* ¶ 14. After approximately ten minutes, Kemp smothered the candle to extinguish the flame and trimmed the wicks as recommended. *Id.*

On or about February 9, 2025, Kemp lit the candle for a second time. *Id.* ¶ 15. She alleges that after about ten to twenty minutes, she heard a fire alarm going off in the room where the candle was lit. *Id.* The candle had a flame "over a foot high." *Id.* Kemp alleges that the candle from Aroma 360 did not come with a lid; so, she attempted to use the lid from a nearby candle to extinguish the flame, but that lid was too small. *Id.* ¶¶ 17–18. Around that time, Kemp's two-year-old son ran into the room and began screaming. *Id.* ¶ 19. In an attempt to get the candle away from her son, Kemp grabbed the candle to move it to a nearby sink. *Id.* She alleges that, as soon as she moved the candle slightly, "it shot up an eruption of flames and melted wax. The wax coated her arms and caused second degree burns." *Id.*

Kemp alleges that Aroma 360 was aware of the danger its candles posed due to numerous social media posts and prior lawsuits but failed to take action to address any defects. *Id.* ¶¶ 21–25.

In its motion to compel arbitration, Aroma 360 alleges that Kemp is subject to an arbitration clause located within the "Terms of Service" that apply to purchases made through its website. ECF No. 15-1 at 2. The "Terms of Service" link was posted at the bottom of Aroma 360's homepage and on various other pages including on the check-out page for consumers making purchases through the website. *Id.* If one were to click on the "Terms of Service" link, the opening cause directs users to "READ THESE TERMS OF SERVICE CAREFULLY" and states that *"*BY ACCESSING, USING, PURCHASING A PRODUCT ON, OR REGISTERING FOR THIS SITE, YOU AGREE TO

BE BOUND BY THE TERMS AND CONDITIONS DESCRIBED HEREIN AND ALL TERMS, AGREEMENTS, GUIDELINES, AND DISCLOSURES INCORPORATED BY REFERENCE." *Id.* at 2–3. It further stated, "**THESE TERMS OF SERVICE INCLUDE AN AGREEMENT TO ARBITRATE ALL DISPUTES BETWEEN US. SEE SECTION 16 BELOW FOR THE DETAILS OF OUR AGREEMENT TO ARBITRATE.**" *Id.* at 3 (bold in original). It also stated that the policies that customers were agreeing to included Aroma 360's "PRIVACY POLICY, COOKIE AND PIXEL POLICY, SUBSCRIPTION POLICY, RETURN POLICY, AND SHIPPING POLICY." *Id.* And it instructed customers, "IF YOU DO NOT AGREE TO ALL OF THESE TERMS, PLEASE DO NOT USE THE SITE OR PURCHASE ANY PRODUCTS ON THE SITE." *Id.* at 3.

   The arbitration clause within the "Terms of Service," in turn, reads as follows:

> In the event of any dispute (other than one that is limited to adjudicating small claims) between you and the Company that relates in any way to or arises out of this or previous versions of the Terms of Service, your use of or access to the Services, the actions of the Company or its agents, or any products or services sold, offered, or purchased through our Services, you and the Company consent to arbitrate that dispute before a single arbitrator under the then current rules of the American Arbitration Association (AAA) in a location near the closest AAA office to you or remotely if one is not reasonably convenient to you or the Company, rather than litigate the dispute in court. You and the Company also agree the Federal Arbitration Act governs the arbitrability of all disputes between you and the Company. If you do not want to be bound by this arbitration provision, you must notify the Company in writing by email to legal@Aroma360.com within 30 days of the date you first agree to the Terms of Service, stating you do not want to resolve disputes with the Company by arbitration.

3

ECF No. 19 at 7. Aroma 360 contends that, given that Kemp's complaint alleges damages in excess of $75,000, the small claims exception (in the parenthetical in the first sentence) would not apply, and Kemp did not opt out of the arbitration clause. *Id.* at 3–4.

Kemp does not dispute the existence of the Terms of Service or the arbitration agreement. She argues, however, that she should not be bound by the arbitration agreement for three reasons: (1) the hyperlink to the terms of service was "small and inconspicuous, and did not provide reasonable notice of a binding and enforceable arbitration agreement," (2) even if she was on notice of the arbitration provision she did not "manifest[] . . . assent" to its terms, and (3) the arbitration provision "is ambiguous and does not clearly extend to personal injury claims." ECF No. 17-1 at 3, 5, 6.

In support of the first two arguments, she provided two screenshots of Aroma 360's checkout page. One of the screenshots, pasted below, shows that the "Terms of service" link was in gray text over a white background below the "Continue to shipping" button. *Id.* at 4. The link was preceded by three links, "A360-Shipping and Returns Policy," "Shipping," and "Privacy policy," and was followed by one additional link, "Cancellations." *Id.*



*Id.* (Fig. 2)

Plaintiff submitted the other screenshot to show that a customer is able to click the "Continue to shipping" button without necessarily scrolling far enough down the page to see the links to the shipping, returns, or cancellations policies, or to the link to the "Terms of service," which contains the arbitration agreement:



5

*Id.* (Fig. 1).

After Aroma 360's motion to compel arbitration was fully briefed, the Court issued an Order noting that the Parties' briefs appear to assume that Maryland law applied to the question before the Court despite the fact that Aroma 360's Terms of Service appear to include a choice-of-law clause selecting Florida law. ECF No. 22. The Court ordered supplemental briefing "to address at minimum (a) which state's law governs the enforceability or applicability of the Terms of Service, (b) caselaw from that jurisdiction (if any) bearing on the questions presented by Defendant's Motion, and (c) in the absence of guidance from the applicable state's courts, whether this Court should certify one or more questions to the highest court of that state, and if so what those certified question(s) should be." *Id.* ¶ 1. In their supplemental briefs, the parties agreed, although for different reasons, that the Court should apply Maryland law. ECF No. 23 at 3–5; ECF No. 24 at 3–4. In Kemp's supplemental brief, she raises an additional argument not raised in her initial response to the motion: that the arbitration agreement lacked consideration, constituting an independent ground for the lack of an enforceable agreement. ECF No. 24 at 4–6.

## II. Standard of Review

"[M]otions to compel arbitration exist in the netherworld between a motion to dismiss and a motion for summary judgment." *Shaffer v. ACS Gov't Servs., Inc.*, 321 F. Supp. 2d 682, 683 (D. Md. 2004). A motion to compel arbitration is treated as one for summary judgment where "the formation or validity of the arbitration agreement is in dispute," *Caire*, 982 F. Supp. 2d. at 589, or where "the court must consider documents outside the pleadings," *Shaffer*, 321 F. Supp. 2d at 683–84; *accord PC Constr. Co v. City of Salisbury*, 871 F. Supp. 2d 475, 477 (D. Md. 2012). *See also Galloway v. Santander*

*Consumer USA, Inc.*, 819 F.3d 79, 85 n.3 (4th Cir. 2016) (quoting *Chorley Enters. v. Dickey's Barbecue Rests.*, 807 F.3d 553, 564 (4th Cir. 2015)) (stating that, under the Federal Arbitration Act, a party seeking a jury trial "must show genuine issues of material fact regarding the existence of an agreement to arbitrate," a standard that is "akin to the burden on summary judgment").

A defendant who seeks to compel arbitration bears the burden of establishing the existence of a binding contract to arbitrate the dispute. *Minnieland Priv. Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co., Inc.*, 867 F.3d 449, 456 (4th Cir. 2017). Arbitration is "strictly a matter of consent"; there is no presumption in favor of arbitration unless the defendant can show that there was an enforceable agreement. *Marshall v. Georgetown Mem'l Hosp.*, 112 F.4th 211, 217–18 (4th Cir. 2024) (citing *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 184 (2019); *Raymond James Fin. Servs. Inc. v. Cary*, 709 F.3d 382, 385–86 (4th Cir. 2013)).

### III.   Discussion

#### A.   Choice-of-Law

In their supplemental briefs, both parties agree that the Court is to apply Maryland law in the consideration of this motion although they reach that conclusion for different reasons. ECF Nos. 23 & 24. Aroma 360 contends that both parties have waived the application of the choice-of-law provision to this motion as neither raised it in the briefing on the motion, neither cited to any Florida law in their briefing, and Plaintiff filed the action in the state of Maryland rather than Florida. ECF No. 23 at 3–4. Plaintiff contends that Maryland substantive law applies as questions regarding the formation of a binding arbitration agreement are to be considered based on the forum state's contract principles. ECF No. 24 at 3. As the issue is uncontested and this

conclusion is supported by law, the Court will apply Maryland principles on contract formation.[2]

### B.   Did the parties form an agreement to arbitrate?

"Whether an agreement to arbitrate was formed is . . . a question of ordinary state contract law principles." *Marshall*, 112 F.4th at 218 (quoting *Rowland v. Sandy Morris Fin. & Est. Plan. Servs., LLC*, 993 F.3d 253, 258 (4th Cir. 2021)). "[T]here is no question that the digital age has changed the nature of contract formation. But [t]he fundamental principles of contract law continue to apply. [T]he person asserting the contract's existence must demonstrate that the person alleged to be bound by the contract (1) had reasonable notice of an offer to enter into the contract and (2) manifested assent to it." *Dhruva v. CuriosityStream, Inc.*, 131 F.4th 146, 151 (4th Cir. 2025) (quoting *Marshall*, 112 F.4th at 218; *Naimoli v. Pro-Football, Inc.*, 120 F.4th 380, 389 (4th Cir. 2024)) (internal quotations and citations omitted). This section first addresses whether the website put Plaintiff Kemp on notice of "an offer to enter into" an arbitration agreement and then turns to whether she manifested assent to it.

#### i.   Notice

"While notice can be actual or constructive, 'in the internet context, the traditional notice inquiry focuses on the design and content of the relevant interface and asks whether it would put a reasonably prudent user on notice of a contract on offer and

---

[2] "[B]ecause application of a choice-of-law provision presupposes that the parties have formed a binding arbitration agreement," in determining whether an arbitration provision is enforceable, the Court must apply state-law principles on contract formation rather than a choice-of-law provision. *Bailey v. Mercury Fin., LLC*, 694 F. Supp. 3d 613, 621 (D. Md. 2023) (citing *Noohi v. Toll Bros., Inc.*, 708 F.3d 599, 607 (4th Cir. 2013); *Johnson v. Cont'l Fin. Co., LLC*, 690 F. Supp. 3d 520, 525 (D. Md. 2023)).

8

its terms.'" *Naimoli*, 120 F.4th at 389 (quoting *Marshall*, 112 F.4th at 218–19); *see Dhruva*, 131 F.4th at 152. When determining whether a website put a user on sufficient notice that a contract was "on offer," courts generally consider five elements: "(1) the simplicity of the screen; (2) the clarity of the disclosure; (3) the size and coloring of the disclosure's font; (4) the spatial placement of the hyperlink; and (5) the temporal relationship to the user's action." *Domer v. Menard, Inc.*, 116 F.4th 686, 695 (7th Cir. 2024) (citing *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 77 (2d Cir. 2017)). "No single factor is dispositive: the question is whether the website provided reasonable notice 'in light of the whole webpage.'" *Id.* (quoting *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 237 (2d Cir. 2016)). This is an objective standard; it turns on whether a reasonable user of the website would have understood that there was "an offer to enter into the contract," not whether the plaintiff subjectively understood that fact. *Dhruva*, 131 F.4th at 151.

"[C]ourts have rejected constructive notice claims based on information that 'would have become visible to [users] only if they had scrolled to the next screen.' Where a user can complete her business on one screen, 'there is no reason to assume that [she] will scroll down to subsequent screens simply because screens are there.'" *Marshall*, 112 F.4th at 219 (quoting *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 289 (2d Cir. 2019); *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 32 (2d Cir. 2002)) (internal citations omitted). In contrast, "when a website provides clear and reasonably conspicuous notice that there are contract terms available by scrolling down or clicking a hyperlink, the user is on reasonable notice of those terms even if she never reads them." *Id.* at 220.

In *Marshall*, on which Kemp principally relies in objecting to arbitration, the plaintiff submitted a job application for a company to which she had applied for a

9

different position four years prior and had been rejected. *Id.* at 214. When she logged into the application portal, the information from her prior application pre-populated but the portal allowed her to update certain items as needed. *Id.* The portal had a "submit" button at the top of the webpage allowing the plaintiff to submit her updated application. *Id.* If the plaintiff were to scroll further down the page, she would have seen the pre-employment statement containing an arbitration agreement that she had signed four years prior and did not require a renewed signature for this new application. *Id.* The Fourth Circuit affirmed the denial of the defendant's motion to compel arbitration, finding that the defendant failed to establish notice or assent. *Id.* at 218. On the issue of notice, the court stated that the plaintiff "may well have known that there was 'unexplored' territory below the screens on which she was operating" but "without more, she was not on inquiry notice that this territory included a contract offer and she was not obliged to go exploring for one." *Id* at 219–20 (citing *Specht*, 306 F.3d at 32). "While a person signing a physical contract 'will rarely be unaware of that fact,' a person using the internet 'may not realize that she is agreeing to a contract at all,' or that contract terms appear on submerged screens or through hyperlinks." *Id.* at 220 (quoting *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1034–35 (7th Cir. 2016)).

In *Dhruva*, the Fourth Circuit found that notice had been provided where "the terms of use hyperlink [was] printed in orange on an uncluttered background, close to the payment tabs that the customer ha[d] to fill out and the button that the customer ha[d] to click and [n]othing about the website design or layout obscure[d] the conspicuous location of the Terms of Use hyperlink." *Dhruva*, 131 F.4th at 152 (internal quotations omitted).

In this case, the link was on an uncluttered screen and in approximately the same font size as the other text on the checkout page. It was underlined. And, of particular significance, it was listed among hyperlinks to other documents that contain terms to which Kemp was agreeing by purchasing the candle, including the "Shipping and Returns Policy," the "Shipping" terms, and the "Cancellations" policy. In other words, Kemp was bound by, for example, the returns policy that a customer would see by clicking on the "Shipping and Returns Policy." For the same reason that she was on sufficient notice of *those* contractual terms to be bound by them, there is no plausible way to distinguish between that link and the link to the "Terms of service" document: both put any reasonable user on notice of the terms contained therein.

To avoid this conclusion, Kemp principally relies on the location of these links: below the "Continue to shipping" button, as opposed to above them or within the borders of that button. She correctly observes that this is a weaker form of notice than in, for example, *Dhruva*, where above the "Sign up now" button for that smartphone app the screen stated, "By subscribing to Curiosity Stream, you agree that you've read our Terms of Use and Privacy Policy." 131 F.4th at 150. But the website here was also sufficient to put a reasonable user on notice of the Terms of Service. Although Kemp's screenshots show an example of how one could possibly click the "Continue to shipping" button without seeing any of the links on the bottom, the hyperlink here was directly below the button to place the purchase. The slightest scroll further down would have revealed the links, which Kemp admits would be an even shorter distance if the website was accessed on a smartphone rather than a computer. This was not the type of "unexplored territory" on "subsequent screens" that the Fourth Circuit was concerned about in *Marshall*. *See* ECF No. 17-1 at 3–4. And although the hyperlink was in a gray

color, rather than orange or blue in other cases, *see Dhruva*, 131 F.4th at 152; *Meyer*, 868 F.3d at 78, the font color was still clearly visible on the white background. Therefore, Aroma 360 has sufficiently shown that the webpage that Kemp used to purchase the candle put a reasonable user on notice of the Terms of Service.

        ii.        **Assent**

Having put a reasonable user on *notice* that there were contractual terms "on offer" does not necessarily establish that such a user was bound by them. Aroma 360 must also establish that Kemp "assented to those terms and conditions." *Naimoli*, 120 F.4th at 389. Although assent to a contract can be manifested through words or conduct, "that does not mean that every use of a website—every purchase, download, application, or the like—can reasonably be understood as consent to contractual terms." *Marshall*, 112 F.4th at 222. "Instead, courts 'have emphasized the importance of clearly signaling to the [user] in some fashion that, by continuing with the transaction or by using a website, she will be agreeing to the terms contained' in an accompanying contract." *Id.* (citing *Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.*, 999 F.3d 828, 837 (2d Cir. 2021)). "But that does not mean the button must be labeled "I accept" or "I agree."" *Dhruva*, 131 F.4th at 155 (citing *Marshall*, 112 F.4th at 222).

In *Edmundson v. Klarna, Inc.*, the Second Circuit articulated three factors as relevant for determining whether one's conduct in the context of web-based contracts constituted assent: "(1) whether the interface clearly warned the user that taking a specific action would constitute assent to certain terms;" "(2) whether notice of the contractual terms was presented to the consumer in a location on the interface and at [a] time when the consumer would expect to receive such terms;" "and (3) the 'course of dealing between the parties,' including whether the contract terms were conspicuously

12

presented to the consumer at each use of the offeror's service and the consumer's conduct in response to the repeated presentation of conspicuous terms." 85 F.4th 695, 704–05 (2d Cir. 2023) (quoting *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 124, 127 (2d Cir. 2012)) (collecting cases) (internal citations omitted). Based on these factors, the court found that the plaintiff had manifested assent where the hyperlink was adjacent to the "confirm and continue" button, the interface was uncluttered, and the terms were presented at a time when a reasonable user would expect to receive them. *Id.* at 707–08.

The Court only has before it screenshots with a button stating "Continue to shipping," not the final button before purchase on Aroma 360's website. Nonetheless, the Court finds that Kemp manifested her assent through her purchase of the candle. The Terms of Service hyperlink was clearly conveyed among other hyperlinks relating to the purchase of the product, as discussed above. Just as a reasonable customer purchasing a candle from Aroma 360's website assents to the company's return and cancellation policies by proceeding with a purchase, Kemp assented (and manifested such assent) to the Terms of Service by clicking the "Continue to shipping" button and purchasing the candle. Aroma 360 has sufficiently shown that Kemp manifested her assent to the Terms of Service.

### iii. Conscionability

Given that "[a]n arbitration agreement is 'valid and enforceable, and is irrevocable, *except* upon grounds that exist at law or in equity for the revocation of a contract,'" under Maryland law "'contract defenses, such as . . . unconscionability, may be asserted in court to invalidate an arbitration agreement.'" *Rankin v. Brinton Woods of Frankford, LLC*, 241 Md. App. 604, 620–21 (2019) (quoting Md. Code Ann., Cts. & Jud. Proc. § 3-206; *Henry v. Gateway, Inc.*, 187 Md. App. 647, 658 (2009)). The party

13

opposing arbitration has the burden to demonstrate that the arbitration agreement was unconscionable. *Id.* at 621 (citing *Henry*, 187 Md. App. at 658).

"There are two aspects of unconscionability—procedural and substantive—both of which must exist for a court to decline to enforce an arbitration provision." *Id.* at 621–22 (citing *Doyle v. Fin. Am., LLC*, 173 Md. App. 370, 383 (2007)). "Procedural unconscionability 'concerns the process of making a contract and includes such devices as the use of fine print and convoluted or unclear language, as well as deficiencies in the contract formation process, such as deception or a refusal to bargain over contract terms.'" *Id.* at 622 (quoting *Stewart v. Stewart*, 214 Md. App. 458, 477 (2013)). "Substantive unconscionability, on the other hand, 'refers to contractual terms that are unreasonably or grossly favorable to the more powerful party and includes terms that attempt to alter in an impermissible manner fundamental duties otherwise imposed by the law.'" *Id.* (quoting *Stewart*, 214 Md. App. at 477–78).

Kemp argues that the arbitration clause is procedurally unconscionable because (a) it was ambiguous with respect to whether it applies to personal injury claims and (b) it failed to provide consumers with reasonable notice of a right to opt-out. ECF No. 17-1 ¶¶ 14–20. As to the first argument, Kemp contends that "[a]rbitration clauses are typically used in commercial contexts, not for personal injury claims" and thus a "reasonable consumer would not read this provision as clearly covering such claims." *Id.* ¶ 18. As to the second argument, Kemp cites to *Mattingly v. Hughes Elec. Corp.*, 147 Md. App. 624 (2002) and *Guanyu Li v. StockX.com*, 349 F. Supp. 3d 517 (D. Md. 2018), to argue that Aroma 360 provided insufficient notice of the opt-out provision based on the provision being "buried" "within an inconspicuous hyperlink, impairing Plaintiff's ability to locate or understand her rights." ECF No. 17-1 at ¶¶ 19–20.

14

Both arguments fail. First, the language of the arbitration provision clearly states that it applies to "**any dispute** (other than one that is limited to adjudicating small claims) between [a consumer] and [Aroma 360] that **relates in any way to or arises out of** . . . **any products** or services **sold**, offered, or purchased through our Services." *Id.* at 7 (emphases added). This language unambiguously conveys that a personal injury claim based on the use of a product purchased from Aroma 360, unless adjudicated as a small claim, would be covered by the arbitration provision.

Second, the opt-out term provides clear instructions for how and when a consumer can opt-out of the arbitration provision, and the cases cited by Kemp are inapplicable. The Appellate Court of Maryland in *Mattingly* held that, without notice of an amendment to the terms of service to add an arbitration provision that was not previously in the terms, those amended terms could not apply to the plaintiff. 147 Md. App. at 636–37. Kemp does not contend that Aroma 360 changed its Terms of Service to add the arbitration provision after she made her purchase. In *Guanyu Li*, Judge Bredar granted the motion to compel arbitration despite noting that, under Michigan law, an arbitration clause **may** be unconscionable where it requires the submission of a specific form in order to opt out of arbitration but the form was not provided within the agreement; Judge Bredar instead rejected as a matter of law the argument that the provision was substantively unreasonable. 349 F. Supp. 3d at 523–24. The opt-out provision here is even clearer than that in *Guanyu Li*. Aroma 360 provided the exact means of opting out (a written email), to whom it should be sent (legal@Aroma360.com), by when it needed to be sent ("within 30 days of the date you first agree to the Terms of Service"), and what needed to be included in the email (a statement that "you do not want to resolve disputes with the Company by arbitration").

15

ECF No. 17-1 at 7. Kemp did not send such an email. Kemp's unconscionability defense fails as a matter of law.

### iv. Consideration

After the Court ordered the parties to file supplemental briefs on which state's law governs the issues presented by Aroma 360's motion to compel arbitration, Aroma 360 filed its supplemental brief first (as ordered) and Kemp filed hers second. *See* ECF Nos. 22–24. In Kemp's supplemental brief, she raised for the first time an argument that the arbitration agreement lacked valid consideration due to its change-of-terms clause, and cited *Trimble v. Entrata, Inc.*, 791 F. Supp. 3d 615 (D. Md. 2025). During the motions hearing, Aroma 360 argued that Kemp waived this argument by not raising it in her response brief to the motion and instead raising it in a supplemental brief to which Aroma 360 would be unable to respond without leave from the Court. Kemp argued that under *United States v. Henderson*, 159 F.4th 213 (4th Cir. 2025) and *Patten Grading & Paving, Inc. v. Skanska USA Bldg., Inc.*, 380 F.3d 200 (4th Cir. 2004), this Court should hold that, because Kemp raised the argument in response to an order for supplemental briefing, the argument should not be considered to have been forfeited.

*Henderson* was considering the Federal Rules of Criminal Procedure, which explicitly provide that a district court "may, for good cause, allow a party to make a new objection at any time before sentence is imposed." Fed. R. Crim. P. 32(i)(1)(D). It was on the basis of that rule that the Fourth Circuit held that the government's inclusion of a request for a sentencing enhancement when the district court requested supplemental briefing was permitted. *Henderson,* 159 F.4th at 219. Given that the Federal Rules of Civil Procedure provides no such "good cause" exception, the Court finds that *Henderson* does not apply. *See* Fed R. Civ. P. 8(d), 15(d). In *Patten Grading*, the Fourth

16

Circuit held that a plaintiff was not prejudiced when a defendant filed a motion to compel arbitration within four months of the start of litigation despite filing an answer and beginning discovery. 380 F.3d at 208–09. The filing of a late motion to compel arbitration for which both parties are still afforded the opportunity to present arguments on the motion on both procedural and substantive grounds presents a different scenario from an argument raised in a final supplemental brief to which Aroma 360 would be prejudiced based on its inability to brief this new argument without further leave from the Court.

Raising a new claim or defense in a reply or supplemental brief based on an intervening court decision generally is allowable as the failure "reflects not a lack of diligence, but merely a want of clairvoyance." *Joseph v. United States*, 574 U.S. 1038, 1039 (2014) (denying petition for writ of certiorari); *see United States v. White*, 836 F.3d 437, 443 (4th Cir. 2016). Not only was *Trimble* published two months prior to the filing of Kemp's response brief, but Kemp cited to it in that brief to support her argument on assent. ECF No. 17-1 ¶ 11. Accordingly, Kemp could have, and should have, raised the argument on consideration at the time of her response brief. Because the argument was raised only in supplemental briefing regarding the choice-of-law provision, the Court will consider that argument to have been forfeited.

## IV.   Conclusion

For the aforementioned reasons, Aroma 360's motion to compel arbitration will be granted. A separate order follows.

Date: February 24, 2026                         _____/s/_____
                                                Adam B. Abelson
                                                United States District Judge